LoRiNG, J.,
dissenting:
The laws for the organization of the army establish a quartermaster’s department, and designate its officers, and assign to them the duty, among others, of providing means of transport, camp and garrison equipage, cavalry and artillery horses, and forage for the army. (28 *62 March, 1812, 2 Stat., 696, Army Regulations 1857, art. 41, § 959.) Then, they provide that the officers of the quartermaster’s department shall be taken from the army, (5 July, 1S38, 5 Stat., 257,) and be sworn and give bonds for the faithful performance of their duties, (1812, 2 Stat., 696,) and that they shall not be interested in the articles they furnish, nor derive any gain from transacting any business in their department other than that allowed by law, (22 May, 1812, 2 Stat., 742.)
These provisions of law are made for the public security, and are to be so administered as to effect it, and I think they are to be construed together as making a positive enactment that the duties of the quartermaster’s department shall bo intrusted only to officers of the army, appointed by the President with the advice of the Senate, and sworn and under bonds for the faithful performance of their duties, and free from any interest adverse to that of the United States, either in the articles furnished or the price paid for them, and therefore I think that General Fremont’s appointment of Mr. Reeside, who was a civilian and not sworn nor under bonds, and who was paid by a commission on the price, so that liis gain was in direct proportion to the price, was illegal, and made no contract with the United States, and that no right of action can arise against them on that contract for anything done in pursuance of it. It was contended for the petitioner that the appointment of Mr. Reeside was authorized by an usage. But if this could be, no such usage was proved, and all that was proved was that officers of the quartermaster’s department employed civilians to inspect horses, and I,hat these civilians were paid by the United States, by the term of their service. But in this such civilians were a]3pointed to their employment by the officers of the quartermaster’s department, and were under their authority and supervision; they were only assistants of such officers, and instruments they used in performing their official duties on their official responsibility. But in the case here, Mr. Ree-side was appointed by General Fremont, and was by him substituted for the officer of the quartermaster’s department in the inspection and purchase of horses for the department of the west.
It was claimed by the counsel for the petitioner that General Fré-mont, in his military department of the west, represented the President as commander-in-chief, audwasin that way authorized to make the appointment of Mr. Reeside. But in this government no officer represents anybody; each derives his authority directly from the law, and is merely its functionary and subject to it, and if the law precludes the appointment of civilians to the duties of the quartermaster’s department, the President, as commander-in-chief, could neither authorize or *63 make suck ail appointment; for if the President could assign one military duty to a civilian he could every other, and this would subvertí the military establishment of the country.
So it was claimed by the counsel for the petitioner that General Fré-mont, as representing in his military department the President, might.-' exercise therein the President’s war power. I do not know what that' power is; but I know that whatever it may be it is subject to and limited by the Constitution and the laws. For I know, and judicially, that every power of every officer in this government is derived from the Constitution and laws, and holds from them its vitality, and can no more exist beyond or without them than a human body can live without the breath that vivifies it.
So it was claimed by the counsel for the petitioner that the exigency of the circumstances in which General Frémont was placed conferred on him the power he used in making Mr. Reeside’s appointment. But circumstances never confer any lawful authority, they only determine the extent to which an authority conferred by law should be exercised; and, besides, I think the evidence does not show the exigency of circumstances required for the argument, oven if that were logical; for admitting that the military department of the west was in an insur-rectionary condition, and that the need of horses for the army was absolute and urgent, and that Mr. Reeside was well qualified for the duties assigned to him, yet there is nothing in the evidence to show that there was any deficiency of officers in the quartermaster’s department to perform its duties, or any incompency in such officers for their functions. And where a duty may be done by the officers, and in the way appointed by law, there is no authority in a major general or the Secretary of War, the President or his war power, to do it otherwise.
The conversations of the President and the Secretary of War, and the conversations and letters of the Quartermaster General and the Postmaster General, were relied upon by counsel as conferring the authority claimed. But none of these purport to do so, or refer in any way to the substitution of civilians for the officers of the quartermaster’s department* in the performance of duties appointed to them by law, and the letter of the Quartermaster General clearly contemplates action through his department in those things that belong to it by law and regulations.
If yas claimed by the counsel for the petitioner that the horses and articles purchased and inspected were received by the officers of the quartermaster’s department in General Fremont’s command, and receipts and vouchers given for them in the usual way, and that they *64 were thus, in fact, procured through that department according to law. But I think the evidence shows that the action of the officers of the quartermaster’s department was merely in obedience to the authority of General Fremont as their commanding officer; and it could not he more, for they were not authorized by the United States to ratify for them General Fremont’s illegal contract, and their reception of the property could have no such effect, for the submission' of subaltern officers to the unauthorized measures of their superior does not legalize them; and the receipts and vouchers were nothing more than evidence of the fact they showed, viz: That the horses, &c., Mr. Reesideinspeeted and purchased had been delivered; and they were not and do not purport to he evidence that the quartermaster’s department inspected and purchased the horses, &c.; and if they did so purport they would be disproved and overborne by the evidence, which proves that Mr. Reeside inspected and purchased the horses, &c., under the authority derived from General Frémont. And this makes the petitioner’s claim hero, and is the only ground of claim set forth in his petition.
I think the question here is not merely one of agency as between individuals; for when the statutes organize a department for the conduct of public affairs, and prescribe qualifications for its officers and oath and bonds for the public security, and appoints to them specific duties, the rule of construction, “ expressio unius est exclusio al-terius,” prohibits those duties to others. This is necessary to effect the policy of the statutes, which is to commit the public affairs to which they relate to those duly qualified, whose duties, powers, responsibility, and emolument are made positive and distinct by law. This policy courts are to maintain, and a contract made in contravention of it is not to be maintained.
"When statutes for the public security prescribe by whom and in what way contracts for the public shall be made, I think they must be made as the statutes prescribe, to be obligatory on the United States; and that parties are to be held to know the statutes and to obey them, and cannot be permitted to evade them by a mere form of pleading and the substitution of a quantum meruit for an illegal special contract. And therefore I think the petitioner cannot recover on the special contract set forth in his petition.
But the counsel for the petitioner claimed that the services of Mr. Reeside and the cash payments made by him incidental to his services, and the horses, &c., inspected and purchased by him, came to the use of the United States, and they had the benefit of them, and are therefore liable on a promise implied by law to pay their value.
*65 But at the common law a benefit conferred is not a ground of legal claim, and does not of itself give a right of action, for a man cannot be made a debtor without his assent, nor can the United States.
Between individuals, where one man receives and uses the property of another, he is'liable at law for its value, but this liability is in no degree founded on or measured by the benefit of the property to him, for his liability is the same whether his use of the property is beneficial or injurious to him. But he is liable because he knew the property was delivered to him for a price and on the condition of its payment, and then his voluntary and personal use of the property is held to imply his.assent to the condition, and thus by implication of law to make a contract to pay for the property.
But in the case of the United States there is no personal use or knowledge by them, and therefore the fact does not exist on which the law implies between individuals that assent which is essential to. a contract. And between individuals where an agent purchases property for his principal without authority, it is not the principal’s contract, and he is not liable on it. And if the agent also uses the property and uses it up in the principal’s service without his assent or knowledge, the principal is not bound by such unauthorized use any more than he was bound by the unauthorized purchase. And the mere fact that he had been benefited by the use of the property does not make him liable, and the seller’s remedy is against the agent who, by transcending his authority, has made himself responsible. And the rule is the same for the United States; and where an officer of the United States purchases property for them without authority and then uses it without authority in their service, they are not legally liable for it and the officer is. And if this were not so, any and every officer of the United States by using property in their service might make them purchasers of it, and their liability would be limitless, and laws regulating their contracts would be futile. And in case of the United States and its officers, as between individual agents and principals, the only use which will sanction and adopt a purchase made without authority is a use made with the assent of the principal, given with a knowledge of the circumstances. Now here the property was purchased and used by General Fremont, and if he had no authority to purchase it he had no authority to use it, for neither he nor any other officer is authorized by the United States to use for them property purchased without authority and in contravention of the statutes’.
The rules for the implication of contracts between individuals can be *66 applied to the United States only where the analogy between them and individuals exists. Where the agent of an individual purchases without authority property which comes to the possession of the principal, he is bound to restore it when he repudiates the contract by which it was obtained; and he is bound to this because of his personal knowledge of the circumstances which make it his legal duty. But the United States have no personality, and personal knowledge or personal possession cannot be predicated of them. And when contracts are illegally made by the officers of the United States, and the property so obtained is used or held by such officer, Congress, which alone can repudiate or affirm the contract or act in any way in the transaction for and as the United States, is not chargeable with the knowledge of what contracts were made or what property was used or is held by the executive departments or their officers, and therefore the fact that property illegally purchased has not been returned, is no evidence that the illegal contract was adopted by or known to the United States, nor any ground for implying’ against them an agreement to pay for it.
The whole case hero is, first, that General Fremont substituted Mr. Reeside for the officers of the quartermaster’s department in the purchase and inspection of horses for the military department of the west. If this was beyond his authority, because contrary to law, so, for the same reason, it was beyond the power of the President or the Secretary of War, or any other executive officer, to authorize it. And if it was beyond their power to authorize a contract contrary to law, it was equally and necessarily beyond their power to sanction or legalize such a contract. And there is no evidence in the case that they ever attempted to do so, and the only evidence referable to that point is that the successor of General Fremont, General Halleck, on succeeding to his command, at once determined Mr. Reeside’s action and office.
Then the only other fact in the ease is that the horses, &c., obtained upon this contract, on which the United States were not liable, were delivered under it to the officers of the army and used in it. But, as I have said, these officers had no authority to ratify for the United States the illegal contract of General Frémont, and therefore their action is not referable to any such interest; neither did they contemplate in their action any new contract for the United States, nor did the petitioner. And on the case I think the question is, whether an officer’s use of property, purchased contrary to law, makes the United States purchasers of it because of its benefit to them. I think it does not, because, at the common law, a mere benefit conferred is not a cause of action, and does not per sc imply a promise to pay for it, and to hold *67 that it did, in this and tlie like cases, would nullify all statutes regulating contracts for the United States, and deprive the public of the protection they were intended to secure; for it would make the government liable for the value of property purchased on contracts made in contravention of those statutes, whether that value was more or less than the contract price.
If the United States derived a benefit from the services and money of the petitioner, and the property he purchased, it may be a propriety that they should render an equivalent for that benefit; but where, as is the case here, tlie contract was made and the property acquired and used without the authority of the United States, I think it is not a legal obligation, and it is that only with which this court deals. The consideration of proprieties and the equity which makes them belong to other branches of the government; and the case shows that a commission was appointed by the Secretary of War to hear and report to him upon claims like this, and that the commission acted and reported, and that Congress paid the amounts so found to be due. On these proceedings it was contended for the petitioner that the United States were estopped from denying the lcgalobligation of this claim, which wasnotpresented to the commission; but I think these proceedings show nothing more than the recognition by the United States of a propriety on their part the extent of which it was for Congress to determine.
The objection here is not to the form of the special contract, or of any failure in the proof of it, but that it was unauthorized and made in contravention of statutes, and I think a party to such a contract cannot waive or take advantage of liis own legal wrong and recover the value of the subject of such a contract on the ground that a benefit accrued to the United States from the use of it in their service by their officers. The rule that a party to a contract forbidden by law or the policy of the law cannot maintain any action upon it in any form is elementary, and I think the reasons of the rule apply here, and the rule belonging to the United States and their officers is, that the United States are not liable for the unauthorized or illegal acts of their officers, and I think that that rule is not to be relaxed or evaded here. On the whole case I think the petitioner cannot recover either on the special contract or the implied contract set forth in his petition, and that the defendants are entitled to judgment, and for the reasons I have stated in this case I think the defendants are entitled to judgment in the suits brought by Benjamin Higdon, Samuel J. Morgan, and Oliver H. G-effroy, submitted with this, and in which the claims are for the *68 prices of horses inspected and purchased by Mr. Reeside under bis contract made with General Frémont.
Wilmot, J., was prevented by illness from taking part in the final disposition of tlie cases.